IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **In re:** | § § | |
| **FRANCISCAN COMMUNITIES VILLA DE SAN ANTONIO**, an Illinois not-for-profit corporation, | § § § § § | **CHAPTER 11 CASE** **CASE NO. 10-50712** |
| Debtor. | § § | |

**MOTION IN SUPPORT OF APPROVAL/ENFORCEMENT OF BREAK-UP FEE OR IN THE ALTERNATIVE, APPLICATION FOR ADMINISTRATIVE CLAIM**

**TO THE HONORABLE RONALD B. KING
CHIEF UNITED STATES BANKRUPTCY JUDGE**

North Hollow SA Retirement Campus, LLC (the "Buyer"), buyer in the above-captioned case hereby files its *Motion in Support of Approval/Enforcement of Break-Up Fee or in the Alternative, Application for Administrative Claim* (the "Motion"). Although Buyer believes that the *Motion to Sell*, as defined below, contemplates a break-up fee and topping fee for Buyer, out of an abundance of caution, Buyer files this Motion in further support of such relief. Thus, in support of its Motion, the Buyer respectfully represents as follows:

**I. PROCEDURAL BACKGROUND**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)..

2. On February 16, 2010 (the "Petition Date"), Franciscan Communities Villa de San Antonio (the "Debtor"), the Debtor in the above-captioned case (the "Case"), filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

2952322.2

3. The Debtor continues to manage and operate its business as Debtor-in-Possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No Creditors' Committee has been appointed in this case by the United States Trustee. Further, no trustee or examiner has been requested or appointed.

4. A further description of the background of the Debtor and the events leading up to the filing of the voluntary petition by the Debtor is provided in the *Declaration of Thomas J. Allison in Support of First Day Pleadings* [Docket No. 3], which is incorporated herein by reference.

## II. FACTUAL BACKGROUND

5. On February 26, 2010, the Debtor filed the *Motion of the Debtor for Order Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code Authorizing the Debtor to (a) Sell substantially all of its Assets Free and Clear of all Liens, Claims, Interests and Encumbrances, and (b) Assume and Assign Certain Executory Contracts and Unexpired Leases* (the "Motion to Sell") [Docket No. 6]. The Motion to Sell contemplated selling the assets to Buyer.

6. The Buyer and Debtor executed an Asset Purchase Agreement. The Buyer also provided a $730,000 deposit. The Buyer also agreed to allow the Debtor use its Asset Purchase Agreement and proposed consideration for the purchase as a stalking horse provided it had a break-up fee. The break-up fee is set out in the Asset Purchase Agreement and the Motion to Sell. The break-up fee is as follows:

> In the event that the Bankruptcy Court orders that approval of the purchase and sale of the Purchased Assets pursuant to this Agreement must be subject to the solicitation of higher and/or better offers pursuant to an auction, then the Seller shall provide the Buyer with the following protections. Any auction (the "**Overbid Auction**") shall be held at a date, time and place reasonably satisfactory to the Buyer, and conducted in accordance with procedures deemed reasonably satisfactory to the Buyer. Without limiting the generality of the foregoing, competing offers in the Overbid Auction from a third party

must be in an amount that is $100,000 higher than the Purchase Price herein plus the Break-Up Fee (unless the Bankruptcy Court requires a lower overbid amount), with any successive offers being made in additional increments of not less than $100,000 of the next highest offer received (unless the Bankruptcy Court requires a lower overbid amount); provided, however, that, if the transaction contemplated by this Agreement is not determined to be the highest and best offer at the Overbid Auction, then the Seller shall (a) pay the Buyer a topping fee (the "**Topping Fee**") equal to the lesser of (i) three percent (3%) of the aggregate Purchase Price and (ii) the maximum amount authorized by the Bankruptcy Court in the sales procedures Order authorizing the Overbid Auction (the "**Sales Procedures Order**"), and (b) reimburse the Buyer for its actual, documented out of pocket expenses, including, but not limited to, due diligence expenses, environmental studies and reasonable attorney's fee, in an amount not to exceed (as to this subsection (b) only) $100,000 in the aggregate (the "**Expense Reimbursement**" and, together with the Topping Fee, the "**Break-Up Fee**"). The Seller shall not close any Alternative Transaction pursuant to an Overbid Auction unless, and it shall be a condition to such closing that, the Sale Procedures Order approve, among other things, the Overbid Auction procedures described in this **Section 11.5(b)** and the Break-Up Fee. If the Bankruptcy Court orders an Overbid Auction, the Buyer shall be permitted to bid at the Overbid Auction and, in its sole discretion, to apply all or a portion of its Break-Up Fee towards its bid amount.

7. The hearing on the Motion to Sell was scheduled for April 5, 2010. On Saturday, two days before the hearing, Buyer learned that the debt held by Sovereign Bank had been purchased by KSL San Antonio. The Debtor and KSL then requested that the Court continue the hearing on the Motion to Sell to May 6, 2010. The Buyer still intends to go forward with the sale; however, if there is an alternative transaction, the Buyer seeks to protect and enforce its right to the Break-Up Fee, or alternatively, an administrative claim.

8. Prior to the Petition Date, there had been no other parties actively interested in the Debtor's assets. Buyer understood that the Debtor's assets had been extensively marketed and although there had been some initial interests, no other parties, including KSL had shown any interest in entering into an agreement with the Debtor to purchase the assets. In fact, no other parties showed any serious interest in the purchasing the assets prior to filing of the Motion to Sell.

2952322.2

9. KSL was one of the numerous parties contacted during the initial marketing process. At the hearing on the Motion to Sell, counsel for KSL indicated that they had reviewed Buyer's Asset Purchase Agreement. It was clear that KSL is using it as a benchmark and that Buyer's Asset Purchase Agreement has proven to be a catalyst for KSL's interest and the interest of other prospective bidders. Thus, Buyer's entry into the Asset Purchase Agreement with the Debtor has provided a significant benefit to the Debtor. Accordingly, the Buyer should be entitled to its Break-up Fee or an administrative claim for the same amount if the Debtor decides to enter into an alternative transaction with another party.

### III. ARGUMENT AND AUTHORITIES

10. Break-up fees and expense reimbursements are often used to encourage potential purchasers of assets to invest the requisite time and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved bidding incentives such as break-up fees under the "business judgment rule," which discourages judicial second-guessing of decisions made in good faith and in the exercise of honest judgment by a corporation's board of directors. *In re Integrated Res., Inc.*, 147 B.R. 650, 657-58 (Bankr. S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (asking whether (a) the negotiation involved self-dealing or manipulation, (b) the fee hampers, rather than encourages, bidding and (c) the amount of the fee is reasonable relative to the purchase price).

11. Other bankruptcy courts, however, have taken broader or more stringent approaches. *See*, *e.g.*, *In re America West Airlines, Inc.*, 166 B.R. 908, 91 (Bankr. D. Ariz. 1994) (inquiring into whether the transaction will "further the diverse interests of the debtor, creditors and equity holders, alike."); *Wintz v. American Freightways, Inc. (In re Wintz Cos.)*, 230 B.R. 840, 846-47 (B.A.P. 8th Cir. 1998) (break-up fees are intended to create an incentive for

2952322.2

increased bidding). The Third Circuit has articulated the relevant inquiry as whether the break-up fees at issue would be allowable as administrative expenses, i.e. whether the break-up fees are actually necessary to preserve the value of the estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 120-21 (Bankr. D. Del. 2005) (applying standard set forth in *O'Brien Envtl.*); *see also, In re Phila. Newspapers, LLC*, 2009 Bankr. LEXIS 3167 (Bankr. E.D. Pa. Oct. 8, 2009) (elaborating the three factors considered by the Third Circuit in *O'Brien Envtl.* as (1) the guarantee of a break-up fee led to more competitive bidding; (2) the bid of the bidder served as a "catalyst" to higher bids; and (3) the promise of a break-up fee enticed a bidder to conduct due diligence on the debtor's value and then proceeded to convert the value to a dollar amount on which other bidders could rely); *In re President Casinos, Inc.,* 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004) (approving, in part, the requested break-up fee for the actual expenses incurred, and allowing the stalking horse to submit a request for additional break-up fees upon the bidder reaching a definitive purchase price); *In re Twenver, Inc.,* 149 B.R. 954, 956-57 (Bankr. D. Col. 1992) (denying approval of break-up in excess of 10% of proposed purchase price, as hampering potential bidding).

12. While this Court has not adopted either approach, it has approved break-up fees in the past. *See, e.g., In re Physicians Specialty Hospital of El Paso East, L.P.,* Case No. 07-30633-lmc, Doc. No. 194 (Bankr. W.D. Tex. Sept. 26, 2007) (approving a break-up fee and expense reimbursements up to 1% of the purchase price, in the aggregate); *see also In re TXCO Resources, Inc.,* Case No. 09-51807-rbk, Doc. No. 813 (Bankr. W.D. Tex. Nov. 30, 2009) (approving a 3% break-up fee). A break-up fee that constitutes a fair and reasonable percentage

of the proposed purchase price and that is reasonably related to the risk, effort, and expenses of the prospective purchaser is generally permissible.

13. To date, the Buyer has approximately $250,000 in expenses alone associated with the due diligence and negotiation of the Asset Purchase Agreement. Not only did the Buyer conduct due diligence such as an environmental phase one study, conduct contract reviews, do site visits, speak with management and others related to the sale, they prepared a presentation that the Franciscan Sisters presented Catholic governing bodies including, but not limited to the Holy See to obtain approval as the buyer. The Buyer's presentation to these parties included Buyer's background working with not-for-profit groups, including Catholic groups. The Buyer is prepared to show this Court its expenses; thus, a Break-Up Fee which includes three percent of the purchase price (which is approximately $397,508.46) plus $100,000 for expenses is not unreasonable in light of the Buyer's expenses.

14. To the extent the Court does not approve a Break-Up Fee, the Buyer believes that it should be entitled to an administrative claim pursuant to 11 U.S.C. § 503 for substantial contribution. Clearly, not only the Debtor, but the other potential buyers have derived substantial benefit from the due diligence performed by Buyer. The Asset Purchase Agreement was made public through the filing, and other parties included KSL are now using it to formulate what would be an appropriate price for the assets. Thus, it is inequitable to not allow the Buyer have the Break-up Fee as a means to reimbursed it for the expenses it incurred in conducting its due diligence, seeking the necessary approvals to purchase the assets and for negotiating the Asset Purchase Agreement.

## RESERVATION OF RIGHTS

15. North Hollow SA Retirement Campus, LLC intends to comply with the Asset Purchase Agreement and is not terminating the Asset Purchase Agreement. This pleading is to ensure that its Break-Up Fee is protected and payable at a closing on an alternative transaction, if any, or in the alternative, that the Break-Up Fee be allowed as an administrative claim in the amount of the Break-Up Fee. North Hollow SA Retirement Campus, LLC reserves all its rights and remedies under the Asset Purchase Agreement and at law and equity.

**WHEREFORE**, North Hollow SA Retirement Campus, LLC respectfully requests that the Court order that it receive the Break-Up Fee at the Closing if there is an alternative transaction, or alternatively allow an administrative claim in the amount of the Break-Up Fee, and further requests such other or further relief as is just and proper.

DATED: April 26, 2010

By: _/s/ Carol E. Jendrzey_
Carol E. Jendrzey
State Bar No. 10617420
Cox Smith Matthews Incorporated
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
(210) 554-5500
(210) 226-8395 (Fax)

**ATTORNEY FOR NORTH HOLLOW SA RETIREMENT CAMPUS, LLC**

2952322.2

## **CERTIFICATE OF SERVICE**

       The undersigned hereby certifies that on the 26th day of April, 2010, a true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system.

                                          */s/ Carol E. Jendrzey*
                                          Carol E. Jendrzey

2952322.2