IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| FRANCISCAN COMMUNITIES VILLA DE SAN ANTONIO, an Illinois not-for-profit corporation, | § § § | Case No. 10-50712 |
| | § | |
| DEBTOR. | § § § | |

# DISCLOSURE STATEMENT FOR LIQUIDATING PLAN

# FRANCISCAN COMMUNITIES VILLA DE SAN ANTONIO, an Illinois not-for-profit corporation, DEBTOR

# TABLE OF CONTENTS

PAGE

IN THE UNITED STATES BANKRUPTCY COURT ......... 1

I.   INTRODUCTION ......... 1

A.   Plan Overview. ......... 1

B.   Purpose of Disclosure Statement. ......... 1

C.   Explanation of Chapter 11. ......... 1

D.   Filing Proofs of Claim or Interest. ......... 3

E.   Voting on the Plan. ......... 3

F.   Confirmation Hearing on the Plan. ......... 4

II.   DISCLAIMERS ......... 5

III.   GENERAL INFORMATION ABOUT THE DEBTOR ......... 5

IV.   DEBTORS' BANKRUPTCY ESTATE ......... 6

V.   SUMMARY OF THE PLAN ......... 6

A.   Classification and Treatment of Claims in the Plan. ......... 6
1.   Class I. Allowed Administrative Claims. ......... 6
2.   Class II. Allowed Priority Claims. ......... 6
3.   Class III. Allowed Secured Claims. ......... 6
4.   Class IV Allowed Unsecured Claims. ......... 7
5.   Class V. Interests. ......... 7

B.   Treatment of Executory Contracts and Unexpired Leases Under the Plan. ......... 7
1.   Rejected if Not Assumed. ......... 7
2.   Deadline To File Claim For Rejection Damages. ......... 7
3.   Bar to Rejection Damages. ......... 7

C.   Discharge. ......... 7

VI.   RISK FACTORS/SPECIAL CONSIDERATIONS ......... 8

VII.   DEBTOR'S CHAPTER 11 CASE ......... 8

A.   Factors Precipitating Commencement of the Debtor's Chapter 11 Cases. ......... 8
Corporate Structure ......... 9
Pre-Petition Financial Condition and Reasons for Filing of the Case ......... 11

Other Events Leading to Chapter 11                                              12

B.    Commencement of Debtor's Chapter 11 Cases.                                13

C.    History and Important Motions and Orders of the Chapter 11 Case.          13
      1.    Cash Collateral.                                                    13
      2.    Patient Care Ombudsman.                                             14
      3.    Motion for Authority to Sell Substantially All Assets.             14
      4.    Closing of Sale of Assets.                                          14

VIII.    FINANCIAL INFORMATION AND FEASIBILITY                                  14

IX.      LIQUIDATION ANALYSIS                                                   15

X.       DISTRIBUTIONS/CLAIM RESOLUTIONS                                        15

A.    Distributions.                                                           15

B.    Claim Resolutions.                                                       16
      1.    Disputed Claims.                                                    16
            a.    Bar Date for Objections to Claims.                            16
            b.    Prosecution of Objections to Claims.                          17
            c.    No Distributions Unless and Until Claims Allowed.             17
            d.    Reserves for Disputed Claims and Disputed Interests.          17

C.    Voting Rights.                                                           17

XI.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN                    17

A     Tax Consequences to Debtor.                                              17

XII.     REQUIREMENTS FOR CONFIRMATION OF THE PLAN                             18

A.    General Confirmation Standards.                                          18

B.    Potential Cramdown of the Plan.                                          20

C.    Absolute Priority Rule.                                                  20

XIII.    CONCLUSION                                                            20

## **EXHIBITS**

EXHIBIT "A"     Debtor's Plan of Reorganization

EXHIBIT "B"     Order Approving Disclosure Statement

EXHIBIT "C"     Ballot

EXHIBIT "D"     Summary of Claims

EXHIBIT "E"     Balance Sheet

# I. INTRODUCTION

## A. Plan Overview.

The Plan provides for the payment of cash to the holders of all Allowed Claims on or after the Effective Date pursuant to the terms of the Plan. Payments shall be made by the Reorganized Debtor from the cash proceeds from the sale of the business, from any available cash collateral and from additional funds to be provided by KSL San Antonio, L.L.C. ("Kisco" or "KSL") as the Purchaser, and pursuant to the Order Approving the Sale of assets (Docket #104, the "Sale Order"), all as more fully set forth in the Plan.

## B. Purpose of Disclosure Statement.

The purpose of this Disclosure Statement is to enable the Interest Holders and Claimants to make an informed decision with respect to the Plan prior to voting on the Plan. After notice and a hearing, the Court approved this Disclosure Statement as containing information, of a kind and in sufficient detail, adequate to enable the Interest Holders and Claimants to make an informed judgment with respect to their acceptance or rejection of the Plan. The Order approving this Disclosure Statement, and setting other deadlines and hearings, is attached hereto as Exhibit "B".

**THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN.**

This Disclosure Statement and the Plan should be read in their entirety prior to voting on the Plan. This Disclosure Statement describes various transactions contemplated under the Plan. In the event of any conflict between this Disclosure Statement and the terms of the Plan, the provisions of the Plan shall control. In the event of any conflict between the Plan and the terms of the documents or agreements executed pursuant to the Plan, the provisions of such documents and agreements shall control. No solicitation of any vote for or against the Plan may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code and no person has been authorized to utilize any information concerning the Debtors or its business other than the information contained in this Disclosure Statement. Each Claimant and Interest Holder is urged to study the Plan in full and to consult with its legal counsel about the Plan and its effect, including possible tax consequences.

## C. Explanation of Chapter 11.

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Upon the commencement of a Chapter 11 case, Section 362 of the Bankruptcy Code provides for an automatic stay of all attempts to collect from a debtor Claims that arose prior to the bankruptcy filing. Generally speaking, the automatic stay prohibits interference with a debtor's property or business.

Under Chapter 11, a debtor attempts to reorganize its business for the benefit of the debtor, its Creditors, and shareholders. Formulation of a plan of reorganization is the primary purpose of a reorganization case under Chapter 11 of the Bankruptcy Code. A plan of reorganization sets forth the means for satisfying the holders of Claims against, and interests in, a debtor. Generally, a Claim against a debtor arises from a normal debtor/creditor transaction, such as the loan of money or the sale of goods or services. An interest in a debtor is held by a party that owns a debtor, such as a general partner in a partnership case or a stockholder in a corporate case.

In the current Chapter 11 Case, the Debtor, FRANCISCAN COMMUNITIES VILLA DE SAN ANTONIO, an Illinois not-for-profit corporation, has sold its assets pursuant to a Sale Motion and Sale Order. It has used the proceeds of that sale to make certain distributions to Secured Lenders and to pay necessary costs and expenses of the Sale. Any remaining proceeds from the Sale of the assets pursuant to previous order of the Court, together with any remaining Cash Collateral and funds received from KSL, shall be used to make payments under the Plan. **The Plan in this case, and which is the subject of this Disclosure Statement, is a liquidating plan pursuant to which the proceeds of all assets shall be used to fund the Plan.**

In general, after a plan of reorganization has been filed, it must be accepted by holders of certain Claims against, or interests in, a debtor. Section 1125 of the Bankruptcy Code requires a plan of reorganization proponent to disclose to Creditors and interest holders sufficient information about a debtor, its assets and the plan of reorganization before acceptances may be solicited. This Disclosure Statement is being provided to Claimants and Interest Holders, to satisfy the requirements of Section 1125 of the Bankruptcy Code.

The Bankruptcy Code provides that Creditors and interest holders are to be grouped into "classes" under a plan of reorganization and that they will vote to accept or reject a plan of reorganization by class. While bankruptcy courts have disagreed on the proper method to be used in classifying Creditors, a general rule of thumb is that Creditors with similar legal rights or that otherwise are similarly situated may be placed together in the same class. For example, all Creditors entitled to priority under the Bankruptcy Code might be placed in one class, while all Creditors holding general unsecured Claims might be placed in a separate class or classes.

The Bankruptcy Code does not require that each holder of a Claim against a debtor vote in favor of a plan of reorganization in order for a court to confirm such plan. Rather, a plan of reorganization must be accepted by each class of Creditors (subject to the exception discussed below). In order for a plan of reorganization to be accepted by a class of Creditors, within such class Creditors holding at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of allowed Claims actually voting on a plan of reorganization in such class must vote for such plan. A court may confirm a plan of reorganization even though less than all classes of Claims and interests vote to accept the plan of reorganization. In this instance, a plan of reorganization must be accepted by at least one "impaired" class of Claims, not including any acceptance of the plan of reorganization by an insider. Section 1124 of the Bankruptcy Code defines "impairment" and generally provides that a Claim which will not be repaid in full or as to which legal rights are altered under a plan of reorganization is deemed to be "impaired." An

interest that is adversely affected under a plan of reorganization is deemed to be "impaired." Under the Plan there *are* impaired classes.

Even if any impaired Class under a plan does not vote to accept a plan, the plan proponent may nevertheless request a court to confirm a plan pursuant to the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code. Those provisions permit a plan of reorganization to be confirmed over the objections of holders of claims or interests, if a court determines that the plan of reorganization does not discriminate unfairly and is fair and equitable with respect to each impaired, dissenting class of Claims or interests.

Independent of the acceptance of a plan of reorganization by all classes, in order to confirm a plan of reorganization, a court must determine that the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied. The Debtor believes that the Plan satisfies each of the requirements of Section 1129(a) of the Bankruptcy Code for confirmation.

Confirmation will make the Plan binding upon the Debtors, all Claimants, and other parties in interest, whether or not they have voted to accept the Plan.

**D.     Filing Proofs of Claim or Interest.**

The deadline for filing Proofs of Claim for most prepetition Claims in this case was July 4, 2010 for all creditors (except a governmental unit); for a governmental unit the deadline was not later than 180 days after the date that the case was filed on February 26, 2010.

**E.     Voting on the Plan.**

Any Classes under the Plan that consist of Claimants that are not impaired are not entitled to vote under the Plan.

To the extent that a Claimant is determined to be impaired, then each such Claimant entitled to vote on the Plan as of the date the Court approves this Disclosure Statement may vote to accept or reject the Plan by completing, dating and signing a ballot enclosed with this Disclosure Statement as instructed below.

Any Claim as to which an objection is filed prior to the date set for the hearing on confirmation of the plan is not entitled to vote, unless the Court, upon application or motion of the holder whose Claim has been objected, to, temporarily allows the Claim in an amount that the Court deems proper for the purpose of accepting or rejecting the Plan. A vote may be disregarded or disallowed if the Court determines that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**BEFORE COMPLETING YOUR BALLOT, PLEASE READ THE VOTING INSTRUCTION SHEET THAT ACCOMPANIES THE BALLOT CAREFULLY.**

After completing, dating and signing the ballot, your ballot must be delivered timely to counsel for the Debtor at the following address in order to be counted:

-3-

**Ronald Hornberger**
**Plunkett & Gibson, Inc**
**Ste 1100, 70 N. E. Loop 410**
**San Antonio, Tx 78216**
**Tel    210-734-7092**
**Fax    210-734-0379**

**IN ORDER TO BE COUNTED (OR TO CONSTITUTE AN EFFECTIVE ELECTION, YOUR BALLOT (OR ELECTION FORM) MUST BE ACTUALLY RECEIVED AT THE ABOVE ADDRESS NO LATER THAN _____, CENTRAL DAYLIGHT TIME, ON _____ . IF YOUR BALLOT (OR ELECTION FORM) IS ACTUALLY RECEIVED AFTER THAT DATE AND TIME, IT WILL NOT BE COUNTED.**

Ballots may be cast by facsimile transmissions to counsel for the Debtor at:

(210) 734-0379, provided that:

- the facsimile is actually received and time-stamped prior to the voting deadline; and
- the original signed ballot, postmarked not later than the day of the voting deadline, is mailed to and received by counsel for the Debtor.

Ballots that are signed and timely returned to the address indicated above, but which do not expressly indicate a vote either to accept or reject the Plan, will be counted by the Debtor as a vote to accept the Plan.

**F.    *Confirmation Hearing on the Plan.***

Section 1128(a) of the Bankruptcy Code requires a court, after notice, to hold a hearing on confirmation of a plan of reorganization. The Court has scheduled the Confirmation Hearing for _____, 2010, at ___ o'clock A.M., Central Daylight Time, before the Honorable Ronald B. King, United States Bankruptcy Judge, in his courtroom, Courtroom No. 3, Room 371, Third Floor, Hipolito F. Garcia Federal Building and United States Courthouse, 615 East Houston Street, San Antonio, Texas 78205.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization. Any objection to confirmation of the Plan must be made in writing. Written objections to confirmation of the Plan, if any, must be filed with the Court and a copy of such written objections must be actually received by counsel for the Debtor at the above address on or before 4:00 o'clock P.M., Central Daylight Time, on _____ , 2010. **Objections not timely filed and actually received by the Debtor's counsel will not be considered by the Court.**

## II.    DISCLAIMERS

ONLY THOSE REPRESENTATIONS SET FORTH IN THIS DISCLOSURE STATEMENT ARE AUTHORIZED BY THE DEBTOR ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION. ANY SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER DATE IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. THE DEBTOR IS UNABLE TO GUARANTY THAT THE INFORMATION CONTAINED IN THE PLAN AND THIS DISCLOSURE STATEMENT IS ENTIRELY WITHOUT ERROR, BUT ALL REASONABLE EFFORTS HAVE BEEN MADE TO ENSURE THAT ALL REPRESENTATIONS ARE AS ACCURATE AS POSSIBLE.

THE SOURCES OF INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ARE THE DEBTOR'S BOOKS AND RECORDS, PLEADINGS FILED WITH THE COURT, AND UNAUDITED FINANCIAL INFORMATION. THE STATEMENTS MADE HEREIN LIKEWISE HAVE NOT BEEN VERIFIED BY DEBTOR'S COUNSEL. ALTHOUGH AN ATTEMPT HAS BEEN MADE TO BE CONSERVATIVE AND REALISTIC, NEITHER THE DEBTOR NOR ITS COUNSEL REPRESENT OR WARRANT THE ACCURACY OF DISCUSSIONS OF FUTURE EVENTS.

THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

IF ANY IMPAIRED CLASS DOES NOT VOTE TO ACCEPT THE PLAN, THE DEBTOR MAY SEEK CONFIRMATION UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE.

## III.    GENERAL INFORMATION ABOUT THE DEBTOR

The Debtor is an Illinois not-for-profit corporation that, until sold, operated a senior living facility in San Antonio, Texas, at 8103 North Hollow, 78240. Debtor opened in March, 2006 as a senior living community consisting of 114 independent living apartments, 24 independent living garden homes and 55 assisted living units, together with several common areas and is located near what generally is referred to as the "medical center area" of San Antonio, Texas.

## IV.    DEBTORS' BANKRUPTCY ESTATE

This Chapter 11 Case was filed on February 26, 2010. Upon the filing of the Case, the Debtor's Estate consisted of all property of whatever nature that the Debtor owed at the commencement of the case, including choses in action, whether matured or contingent. Pursuant to the Sale Motion and the Sale Order, substantially all assets of the Debtor have been sold.

## V.    SUMMARY OF THE PLAN

**THE FOLLOWING SUMMARY OF THE PLAN IS QUALIFIED BY THE PRECISE TERMS AND PROVISIONS OF THE PLAN TO THE EXTENT THE TERMS OF THE PLAN DIFFER FROM THE SUMMARY SET OUT BELOW, THE TERMS OF THE PLAN SHALL CONTROL. THE DEFINITIONS CONTAINED IN THE PLAN ARE INCORPORATED HEREIN FOR ALL PURPOSES**

*A.    Classification and Treatment of Claims in the Plan.*

   **1.    Class I.    Allowed Administrative Claims.**

Allowed Administrative Claims have been paid in full in cash except for amounts due and owing to the Attorney for the Debtor. By agreement the fees of the Attorney for Debtor shall be limited to a total of $135,000.00, of which a total of up to $100,000.00 shall come from the agreed fund to be provided by KSL and $35,000.00 shall come from the Retainer paid by the Debtor into the Trust Account of the Attorney prior to the filing of the Case. The Class is not impaired.

Other Administrative Claims consisted of the day to day costs of operations of the Debtor's business from and after the Petition Date, all of which have been paid in full in the ordinary course of Debtor's operations and a claim made by an unsuccessful bidder for the Debtor's assets, North Hollow (previously paid in full at the allowed amount of $115,000.00) There also was a "substantial contribution claim" allowed in the amount of $150,000.00 which has been paid in full to the Franciscan Sisters of Chicago Service Corp.

   **2.    Class II.    Allowed Priority Claims.**

Allowed Priority Claims will be paid in full in cash, including interest at the applicable statutory rate. The Class is not impaired. ***There are no Allowed Priority Claims.***

   **3.    Class III.    Allowed Secured Claims.**

Allowed Secured Claims have been paid in full to the extent that payment shall be made on any Allowed Secured Claim from the proceeds of the Asset Sale. The Class is impaired.

4. **Class IV        Allowed Unsecured Claims.**

Allowed Unsecured Claims will be paid in cash, a pro-rata payment from the available funds as noted above in paragraph I-C.

5. **Class V.        Interests.**

There shall be no distribution make to the owner of the Debtor and it is anticipated that, following the consummation of the Plan, the Debtor will take such steps as are necessary under applicable state law to dissolve and cease to exist as a legal entity.

**B.    *Treatment of Executory Contracts and Unexpired Leases Under the Plan.***

1. **Rejected if Not Assumed.**

Except as provided below, the Plan constitutes and incorporates a motion by the Debtor to reject all prepetition executory contracts and unexpired leases to which the Debtor is a party, except for an executory contract or unexpired lease that (a) has been previously assumed or rejected pursuant to the **Sale Order**, or (b) that is the subject of a currently pending motion to assume. The Confirmation Order shall represent and reflect an order of the Court approving such rejections as of the Effective Date.

2. **Deadline To File Claim For Rejection Damages.**

Any Claim seeking damages as a result of the rejection of an executory contract or unexpired lease shall be filed within twenty (20) days of the date of the hearing on Confirmation of the Plan. Any such claim shall be served upon the Debtor and upon counsel for the Debtor.

3. **Bar to Rejection Damages.**

If the rejection of an executory contract or unexpired lease by the Debtor results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever **barred** and shall not be enforceable against the Debtor or Reorganized Debtor unless a Proof of Claim is filed with the Court and served upon counsel for Debtor within twenty (20) days of the date of the hearing on Confirmation of the Plan. Any Claim so filed shall constitute a Class IV (Unsecured) Claim . Any objections to Claims filed pursuant to this provision shall be governed by the procedures provided in the Plan concerning objections to claims.  Debtor believes that all such claims have been paid.

**C.    *Discharge.***

**Except as otherwise provided in the Plan, on the Effective Date, all Claims against the Debtor will be deemed discharged. It is intended that, following the payment of all claims pursuant to the Liquidating Plan, Debtor will be dissolved and cease to exist. It is provided, however, that, pursuant to 11 USC § 1141(d)(3) the Confirmation of this Plan shall not result in a discharge the debtor for the reasons that a) the plan provides for the**

liquidation and distribution of all or substantially all of the property of the estate, b) the Debtor will not engage in business after consummation of the plan, and c) the Debtor, being a not for profit corporation, would be denied a discharge under section 727(a) of the Bankruptcy Code if this case were a case under chapter 7 of the Bankruptcy Code.

THE PLAN CONTAINS NUMEROUS OTHER TERMS AND PROVISIONS. WHILE THE DEBTOR HAS SOUGHT TO SUMMARIZE THE MORE SIGNIFICANT TERMS AND PROVISIONS WITHIN THIS DISCLOSURE STATEMENT, YOU ARE URGED TO READ THE PLAN CAREFULLY AND IN ITS ENTIRETY. THIS DISCLOSURE STATEMENT IS MEANT TO BE A SUMMARY ONLY. NOT ALL OF THE PROVISIONS OF THE PLAN HAVE BEEN FULLY SET OUT OR DISCUSSED WITHIN THIS DISCLOSURE STATEMENT. AGAIN, YOU ARE REFERRED TO THE PLAN IN ITS ENTIRETY.

## VI.    RISK FACTORS/SPECIAL CONSIDERATIONS

The holders of Claims should consider, among other matters discussed in this Disclosure Statement, the risk factors and special considerations relating to the Debtor and the Plan set forth below. The Debtor cannot predict the likelihood of the occurrence of any of the following factors or events. However, these risks are inherent in the Plan and should be considered before voting on the Plan.

There can be no assurance that the Plan as proposed will be approved by the requisite number of holders or amounts of Claims or by the Court. In the event the Plan is not confirmed within the exclusive time period allotted by the Bankruptcy Code for the Debtor to propose and confirm the Plan, any other party-in-interest may propose a plan or reorganization, and subsequent plans of reorganization may be proposed and approved by the requisite majorities and be confirmed by the Court. Notwithstanding Court approval, it is possible that the Plan may not be consummated because of other external factors that may adversely affect the Debtor and his business.

## VII.    DEBTOR'S CHAPTER 11 CASE

*A.    Factors Precipitating Commencement of the Debtor's Chapter 11 Cases.*

**Background The Senior Living Facility**

VSA opened in March 2006 as a senior living community consisting of 114 independent living apartments, 24 independent living garden homes and 55 assisted living units, together with several common areas and located twenty minutes west of San Antonio, Texas.

At all times during the period of its operations the Debtor was licensed by the Texas Department of Aging and Disability Services (the "TDADS"). During the period of Debtor's operations TDADS conducted annual on-site regulatory compliance and quality of care surveys. TDADS surveyed the Debtor's assisted living services to assess compliance with state standards

and regulations. The Debtor was in substantial compliance since opening its doors and, to the extent any minor deficiencies were noted, they were promptly corrected.

## Corporate Structure

VSA is an Illinois not-for-profit corporation, approved by the Archdiocese of San Antonio, Texas for inclusion in the group ruling issued to the United States Catholic Conference and listed in the Official Catholic Directory, establishing VSA as exempt from federal income taxation pursuant to Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

VSA is affiliated with Franciscan Sisters of Chicago Service Corporation ("FSCSC"), an Illinois not-for-profit corporation and tax-exempt 501(c)(3) organization that oversees the senior services facilities and programs sponsored by the Franciscan Sisters of Chicago. FSCSC is the sole corporate member of VSA.

## Capital Structure

The Debtor was highly leveraged - with approximately $36,010,000 in prepetition, secured debt plus accrued, but unpaid, interest, fees and expenses due and owing (the "Prepetition Indebtedness") incurred in connection with the construction of VSA and only approximately $19,000,000 in assets. As of January 31, 2010, the principal amount of VSA's outstanding institutional debt was:

| Type | Letter of Credit Bank | Original Debt | Outstanding Debt |
|------|----------------------|---------------|------------------|
| 2004A Fixed Rate Bonds | | $9,060,000 | $9,060,000 |
| 2004B Extra's Bonds | | $2,250,000 | $2,250,000 |
| 2004C Variable Rate Bonds | Sovereign Bank | $24,700,000 | $24,700,000 |
| Total Debt: | | $36,010,000 | $36,010,000 |

## Series 2004 Bonds

Debtor issued Series 2004 Bonds pursuant to two separate bond trust indentures dated as of December 1, 2004 between HFDC of Central Texas, Inc. ("HFDC") and J.P. Morgan Trust Company, National Association ("J.P. Morgan") as bond trustee. The 2004A Fixed Rate Bonds and 2004B Extra's Bonds were issued pursuant to that certain Indenture of Trust between HFDC of Central Texas, Inc. and J.P. Morgan Trust Company, National Association, as Bond Trustee

-9-

dated as of December 1, 2004 with respect to the HFDC of Central Texas, Inc. Revenue Bonds (Villa de San Antonio Project), Series 2004A and Series 2004B (the "Series 2004A and 2004B Bond Indenture"). The 2004C Variable Rate Bonds were issued pursuant to that certain Bond Trust Indenture between HFDC of Central Texas, Inc. and J.P. Morgan Trust Company, National Association, as Bond Trustee dated as of December 1, 2004 with respect to the HFDC of Central Texas, Inc. Revenue Bonds (Villa de San Antonio Project), Series 2004C (the "Series 2004C Bond Indenture").

## Issuance of Series 2004 Notes

HFDC then loaned the proceeds of the Series 2004 Bonds to VSA pursuant to that certain Loan Agreement between HFDC of Central Texas, Inc. and Franciscan Communities Villa de San Antonio. dated as of December 1, 2004 with respect to the HFDC of Central Texas, Inc. Revenue Bonds (Villa de San Antonio Project) Series 2004A and Series 2004B (the "Series 2004A and 2004B Loan Agreement") and that certain Loan Agreement between HFDC of Central Texas, Inc. and Franciscan Communities Villa de San Antonio dated as of December 1, 2004 with respect to the HFDC of Central Texas, Inc. Weekly Adjustable Rate Revenue Bonds (Villa de San Antonio Project) Series 2004C (the "Series 2004C Loan Agreement," and, together with the Series 2004A and 2004B Loan Agreement, the "Loan Agreements"). VSA also executed the Series 2004 Notes to evidence its repayment obligations.

## Security for the Series 2004 Notes

The Series 2004 Notes are equally and ratably secured by: (a) a security interest in the "Gross Revenues" of VSA and any other future Member of the Obligated Group; and (b) a lien on, and security interest in, VSA's real property pursuant to that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of December 1, 2004.

## Security for the Series 2004 Bonds

The Series 2004 Bonds are secured by certain liens and security interests granted by VSA to J.P. Morgan as trustee under a Master Trust Indenture dated as of December 1, 2004. Specifically, VSA granted to J.P. Morgan a security interest in "Collateral" including all equipment, receivables, contracts, rights to payment of money, obligations and tax refunds, inventory, intellectual property rights, general intangibles, liens, guarantees and information related to the foregoing (collectively, the "*Series 2004 Bond Collateral*").

The Series 2004C Variable Rate Bonds are also secured by an irrevocable letter of credit (the "*Letter of Credit*") issued by Sovereign Bank (also referred to herein as the "***Sovereign***" and collectively with J.P. Morgan, the "*Prepetition Lenders*") pursuant to a reimbursement agreement dated as of December 1, 2004 between VSA and Sovereign Bank (the "*Reimbursement Agreement*"). As a condition to the issuance of the Letter of Credit, Sovereign Bank required that VSA grant to Sovereign Bank a security interest in the same "Collateral"

defined in the J.P. Morgan Security Agreement (collectively, the *"Letter of Credit Collateral"*, and collectively with the Series 2004 Bond Collateral, the *"Prepetition Collateral"*).

**Intercreditor Agreement**

That certain Intercreditor Agreement dated as of December 1, 2004 by and among J.P. Morgan Trust Company, National Association, Sovereign Bank and Franciscan Communities Villa de San Antonio (the *"Intercreditor Agreement"*) further provides that to secure payment of the obligations under the Series 2004 Notes, J.P. Morgan Trust Company and Sovereign Bank shall have a first lien on and security interest in the Shared Collateral. Shared Collateral is defined as (i) the Facility and Gross Revenues and the properties, moneys and proceeds subject to the lien and security interest of the Master Trust Indenture and/or the Mortgage, (ii) all contracts, rights and interests subject to the Assignments, and (iii) all money from time to time held under the Master Trust Indenture.

**Actions Following the Chapter 11 Filing Affecting the Secured Indebtedness**

The Bank of New York Mellon Trust Company, National Association, as indenture trustee, a secured creditor and party-in-interest in the bankruptcy case ("BNYM") and KSL (referred to in the Stipulation as "Kisco") entered into a Stipulation in agreement of Kisco's credit bid rights, the percentage of debt attributable to holders of Series 2004A, 2004B and 2004C Bonds, and the funds held on account by BNYM. (Docket #96) Kisco and BNYM sometimes are referred to collectively in this Disclosure Statement and the Plan as "Secured Lenders" or singularly each as "Secured Lender". By virtue of such stipulation, it is agreed that Kisco holds 81.0885865% of the aggregate debt under the Series 2004A and 2004B Bond Indenture and the Series 2004C Bond Indenture. The balance of the total of the Secured Debt is held by BNYM, as indenture trustee. BNYM and KSL (or its predecessor in interest, Kisco) together are referred to as "Secured Lenders" and separately as a Secured Lender.

**Pre-Petition Financial Condition and Reasons for Filing of the Case**

Debtor's business plan pre-petition revolved around the selling of units and the leasing of other units in the facilities. The decreased demand for the Debtor's residences, combined with the Debtor's fixed costs, resulted in the Debtor's being unable to operate its business profitably and to pay its debts as they became due. Accordingly, the Debtor commenced this chapter 11 case and filed a Motion to sell substantially all of its assets and wind proceeded to up its business.

VSA's ability to service and retire its debt is dependent upon the receipt of entrance fees for certain of its units, or, in the alternative, renting the units. VSA's occupancy rates and entrance fee revenue, however, never reached the levels necessary for VSA to break-even. VSA's revenues were generated from monthly fees and entrance fees. With respect to entrance fees, a resident would pay an entrance fee that ranged between $130,000 and $158,000 per unit. This entrance fee was 90% refundable upon death or the occurrence of certain other specified

events (such as a resident moving out of the unit and the receipt of a replacement entrance fee for that unit).

Ordinarily, entrance fees were funded with the proceeds of the sale of a resident's prior home. Because of the ongoing housing market crisis, many prospective residents were not able to sell their homes. Moreover, construction delays of over one year resulted in a significant number of cancellations. As a result, entrance fee revenue was significantly less than what was projected in the feasibility study commissioned by FSCSC prior to building the VSA facilities. While the Debtor's occupancy levels were significantly less then what was projected, resulting in lower revenue, its fixed operating expenses (particularly salaries, wages and related benefits) were higher than anticipated. VSA was not able to offset these fixed costs with additional revenue, which could only be generated by higher census levels.

As of the Petition Date, VSA's occupancy rates in the various facilities were approximately as follows:

| | |
|---|---|
| Independent Living Units: | 67% |
| Garden Apartments | 54% |
| Assisted Living Units | 67% |

For the first six months ended December 31, 2009 (fiscal 2010), VSA had operating revenue of $2,237,000 and a net loss of $834,000. These results do not include depreciation, due to the fact that the assets were held for sale. Under generally accepted accounting principals, assets held for sale are not depreciated. VSA's results for the first six months of fiscal year 2010 would have been significantly worse if depreciation had been recorded.

With approximately $1,500,000 in annual interest expenses and $8,100,000 in other expenses offset by only $3,600,000 in total annual revenue, the Debtor faced a shortfall of approximately $6,000,000 for the year ended June 30, 2009. Projected results for the year ending June 30, 2010 were improved with projected shortfall of approximately $3,500,000 but substantially less then what was necessary for the Debtor to operate its business.

To fund the shortfall, FSCSC provided additional funding to the Debtor to enable the Debtor to continue operating. FSCSC informed VSA that it would no longer continue to fund such shortfalls. Without sufficient funds to operate, the Debtor filed its chapter 11 case to facilitate the sale of its assets as a going concern and to minimize the disruption to its residents.

**Other Events Leading to Chapter 11**

The primary factors contributing to the Debtor's financial problems were: (i) its leveraged debt structure; (ii) a substantial decrease in the demand for the Debtor's assisted living and independent living residences; and (iii) the lasting effect of the current economic and housing crises.

The decreased demand for the Debtor's residences, combined with the Debtor's fixed costs, resulted in the Debtor's being unable to operate its business profitably and to pay its debts as they became due. The Debtor was unable to make its September, 2009 interest payment to Sovereign Bank (a secured lender), triggering a default under the Indentures and the Master Trust Indenture covering its secured indebtedness.

Accordingly, the Debtor commenced this chapter 11 case to sell substantially all of its assets and wind up its business. The Debtor extensively marketed its assets over the eight months prior to the filing of the Chapter 11 Case, resulting in it's entering into an Asset Purchase Agreement with North Hollow SA Retirement Campus, LLC prior to the Petition Date. VSA pushed to complete the sale process through this chapter 11 case on an expedited basis. Through a variety of events, including the purchase of approximately 81% of its secured indebtedness by Kisco , Debtor's efforts resulted in an auction sale in open court. The successful bidder was KSL as successor in interest to Kisco . The successful bid by KSL was a combination of credit bidding of a portion of the secured indebtedness (pursuant to the "Stipulation"—Docket #96) and cash, together with the assumption and assignment of executory contracts and leases by Debtor to KSL as purchaser. As part of the purchase KSL agreed to pay the "cure costs" for the assumption of such executory contracts and leases and, to that end, there remains a balance in Debtor's Attorney's Trust Account to cover the same pending final reconciliation and agreement between Debtor and KSL, with the balance remaining, if any, to be refunded to KSL. From the cash proceeds of the Sale BNYM as indenture trustee on the remaining approximately 19% of the Debtor's secured bonded indebtedness was paid a cash amount of $2,848,558.99 on or about June 29, 2010. BNYM remains to be paid its "share" of the remaining Cash Collateral on hand, subject to final reconciliation and agreement among KSL, BNYM and Debtor. A reserve has been set aside and remains in escrow at the Title Company at which the sale was closed, Alamo Title Company. There is no claim by BNY or by KSL for any unsecured deficiency; thus, neither BNY nor KSL will participate as unsecured creditors in the payments to be made to the Allowed Class IV Unsecured Claims from the fund of up to $100,000.00 to be provided by KSL pursuant to previous Order of the Court for the purpose of funding the payments to the Allowed Class IV Unsecured Claims (the "Allowed Class IV. Unsecured Creditor Fund").

## B.    *Commencement of Debtor's Chapter 11 Cases.*

The Debtor commenced the case on February 26, 2010. The Debtor operated the business from that date until the closing of the sale of assets approved by the Court, or, until the sale of its assets close pursuant to the Sale Order in June , 2010. From and after such date the Debtor has had no business operations other than to conduct accounting and other operations necessary to the payment of Claims and the closing down of its business operations and the closing of the Sale of Assets.

## C.    *History and Important Motions and Orders of the Chapter 11 Case.*

### 1.    Cash Collateral.

On February 26, 2010 a Motion (Docket #4) was filed seeking authority for the use of Cash Collateral by the Debtor (the "Cash Collateral Motion"). The Motion sought the use of the cash collateral of the Secured Lenders. The Cash Collateral Motion was granted by an Interim

Order entered on March 16, 2010 (the "Interim Cash Collateral Order"). On March 29, 2010 a Final Order Allowing Use of Cash Collateral was entered (the "Final Cash Collateral Order" Docket #60).

### 2. Patient Care Ombudsman.

A Motion (Docket #11) was filed by the Debtor seeking an Order of the court that there is no need for the appointment of a Patient Care Ombudsman pursuant to 11 U. S. C. § 333. On June 18, 2010, an Order (Docket #117) was entered by the Court pursuant to § 333(a)(1) that the appointment of such ombudsman is not necessary.

### 3. Motion for Authority to Sell Substantially All Assets.

On February 26, 2010 (Docket #6) Debtor filed a Motion for Authority to Sell Substantially All Assets (the "Sale Motion"). On May 21, 2010 (Docket # 104) the Court entered its Order Approving the Sale Motion (the "Sale Order").

### 4. Closing of Sale of Assets.

Pursuant to the Sale Motion and the Sale Order, substantially all of Debtor's assets were sold to KSL. The Sale closed in June, 2010.

Net proceeds of the Sale were defined in the Sale Order to be the cash portion remaining after payment of the allowed administrative expense of Cain Brothers, not to exceed $450,000.00 (this claim previously has been paid), and the allowed administrative expense claim of Debtor's counsel, not to exceed an additional $100,000.00 beyond the original retainer held by Debtor's counsel. This amount has been reserved and transferred to the Trust Account of Debtor's counsel. Pursuant to the Sale Order, there shall be allowed as a further deduction solely from the net proceeds payable to KSL, (a) an amount not to exceed $100,000.00 for payment of allowed unsecured claims (the "Allowed Class IV Unsecured Claims Fund" or, the "Fund") and (b) an amount not to exceed $115,000.00 for payment of the allowed administrative expense claim of North Hollow SA Retirement Campus, LLC (the stalking horse and unsuccessful bidder, "North Hollow"), if any. The payment to North Hollow for its allowed administrative expense claim was to be paid to North Hollow on or before the later of fourteen (14) days after the entry of an order allowing such administrative expense claim or five (5) business days after Closing. This claim previously has been paid in full.

### VIII. FINANCIAL INFORMATION AND FEASIBILITY

By Order entered on May 21, 2010 (Docket #104, the "Sale Order") the Bankruptcy Court approved the sale of substantially all the assets of the Debtor to KSL for $17,225,281.00 , plus the assumption or satisfaction of certain assumed and assigned contracts and the provision of certain further funds regarding minimum payments to or on behalf of certain claims, all as further set forth in the Sale Order. The Debtor retained its ownership of outstanding accounts receivable.

The sale of the assets was closed at Alamo Title Company and certain payments in cash were made to secured bondholders represented by BNYM by the payment to BNYM, on June 29, 2010, of the amount of $2,848,558.99 from the sales proceeds. There remains an undetermined amount of the pro rata share of remaining Cash Collateral due and owing to the BNYM bondholders which will be paid in cash on the Effective Date if not already paid by that date, or at such later date as an Order of the Court is entered determining the share to be paid to BNYM. A total of $100,000.00 has been held back at Alamo Title Company as a reserve for final payment reconciliation. *Neither of the Secured Lenders shall have any Allowed Unsecured or Undersecured Claim.*

All other Plan payments can be made either from the remaining Cash Collateral or from the further payments by KSL. An analysis of Claims is attached as Exhibit "D". Based upon current available cash not dedicated to the payment of the BNYM share of cash collateral and the further cash available from KSL, there will be a fund of at least $100,000.00 available for payment of Allowed Class IV (Unsecured) Claims. The Debtor may dispute a number of these claims. Successful dispute and disallowance or reduction in amounts of any of the Class IV (Unsecured) Claims will have the effect of increasing the percentage pay out to the Allowed Class IV (Unsecured) Claims.

## IX.    LIQUIDATION ANALYSIS

The Debtor's assets have been liquidated and what remains is cash collateral of the Secured Lenders. The payments to be made to the holders of the Allowed Class IV (Unsecured) Claims shall be from the Allowed Class IV Unsecured Creditor Fund.

Unless otherwise noted, the discussion of liquidation values is not based upon an appraisal, but only reflects the Debtor's opinion. Also, liquidation value includes only the Available Proceeds from the sale of assets only. The business of the Debtor ceased as a going concern upon the closing of the sale of assets previously approved by the Bankruptcy Court in the Sale Order.

Based upon Debtor's opinion of the fair market value of the assets and the total liabilities of in excess of $35 million, liquidation of the assets never would have paid all claims of the Secured Lenders; thus, in a liquidation the Allowed Class IV Unsecured Claims could expect to receive nothing. As a result of the negotiations between the Debtor and KSL, KSL agreed to provide a fund of up to $100,000.00 to fund payments to the Allowed Class IV Unsecured Claims. Thus, under the Plan, there will be at least a pro-rata payment from this Fund. In the event of a dismissal of the case or a conversion of the case to a case under Chapter 7, there would be no funds available for any distribution to the Allowed Class IV Claims.

## X.    DISTRIBUTIONS/CLAIM RESOLUTIONS

### A.    *Distributions.*

Unless otherwise specified in the Plan or in the Confirmation Order, all distributions required to be made under the Plan shall be made by Reorganized Debtor, as the Plan Agent, and shall commence on the Effective Date or as soon as practicable thereafter. Payments to be made

in Cash shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank, such mode of payment to be at the sole discretion of Reorganized Debtor. Any fee charged or assessed for any payment made by wire transfer shall be deducted from the payment so made by such method of payment.

*Neither of the Secured Lenders shall have any Allowed Unsecured or Undersecured Claim.*

*The ONLY distributions contemplated by this Plan are those to Debtor's attorneys (but only to the extent provided for by the original retainer held by the attorneys and the additional up to $100,000.00 to be provided for by KSL under the provisions of the Sale Order) and those to the Class IV Unsecured Claims.*

Distributions and deliveries to holders of Allowed Claims shall be made at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if Reorganized Debtor has been notified of a change of address). If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until Reorganized Debtor is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest. All Claims for undeliverable distributions shall be made on or before one year after such distribution has been returned to Reorganized Debtor. After such date, all unclaimed distributions shall revert to and become property of Reorganized Debtor, and the claim of any holder with respect to such distributions shall be discharged and forever barred.

Checks issued by Reorganized Debtor in respect of Allowed Claims shall be null and void if not cashed within **ninety (90) days** of the date of issuance thereof. Requests for reissuance of any check shall be made directly to Reorganized Debtor by the holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check shall be made **on or before the later of one hundred eighty (180) days after the Effective Date or ninety (90) days after the date of issuance of such check.** After such date, all Claims in respect of such checks shall be discharged and forever barred.

**B.    Claim Resolutions.**

    **1.    Disputed Claims.**

        **a.    Bar Date for Objections to Claims.**

As soon as practicable, **but in no event later than 60 days after the Effective Date, objections to Claims shall be filed with the Court and served upon the holders of each of the Claims to which objections are made.** Objections shall be filed by the Debtor and/or Reorganized Debtor only. Debtor believes that all claims matters have been resolved.

**b.  Prosecution of Objections to Claims.**

The Debtor and/or Reorganized Debtor shall use its best efforts to object to, compromise, and/or settle all Claims in amounts accurately reflecting the amount of each respective Claimant's Allowed Claim, subject to reasonable litigation expense limits. The Debtor and/or Reorganized Debtor shall litigate to judgment, settle or withdraw objections that the Debtor and/or Reorganized Debtor may file to Disputed Claims. The Debtor and/or Reorganized Debtor shall be permitted to settle any Disputed Claim without further notice or Court approval. Any stipulations regarding a Claim filed by the holder of a Claim and the Debtor and/or Reorganized Debtor shall be deemed an amendment by the Debtor to his respective Schedules.

**c.  No Distributions Unless and Until Claims Allowed.**

No distribution shall be made with respect to all or any portion of any Class IV Unsecured Claim unless and until all objections to any Disputed Class IV Unsecured Claims have been resolved and any such Disputed Claim has become an Allowed Claim. Distributions to the Allowed Class IV Unsecured Claims shall be made only after any and all objections to any Disputed Class IV Unsecured Claims have been resolved fully by Final Orders of the Court.

**d.  Reserves for Disputed Claims and Disputed Interests.**

No Reserve for disputed Class IV Unsecured Claims shall be required as no distributions to the holders of Allowed Class IV Unsecured Claims shall be made until after all Objections to any Class IV Unsecured Claims have been resolved by Final Order of the Court.

**C.  *Voting Rights.***

Under the Plan, only the votes of the Secured Lenders and the Class IV Unsecured Claims are impaired and will be solicited.

**XI.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**A  *Tax Consequences to Debtor.***

Debtor will pay all Allowed Class IV Unsecured Claims a pro-rata share of the Unsecured Creditor Fund, a fund of up to $100,000.00 consisting of any remaining cash collateral of KSL and additional funds to be provided by KSL of up to $100,000.00, pursuant to previous Order of the Court for such purpose.

Debtor is an Illinois not for profit corporation and pays no income taxes. Further, this is a liquidating plan, following the completion of which Debtor will cease to exist.

**B.  Tax Consequences to Claimants.**

Each Claimant is urged to consult with a tax professional to determine what, if any, tax consequences will result from the receipt of payments under the Plan.

## XII. REQUIREMENTS FOR CONFIRMATION OF THE PLAN

*A.* *General Confirmation Standards.*

At the Confirmation Hearing, the Court will determine whether the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied. If those requirements have been satisfied, the Court will enter the Confirmation Order. The requirements of Section 1129(a) of the Bankruptcy Code are as follows:

> (1)    The plan complies with the applicable provisions of the Bankruptcy Code.

> (2)    The proponent of the plan complies with the applicable provisions of the Bankruptcy Code.

The plan has been proposed in good faith and not by any means forbidden by law.

(4)    Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

(5)(A)(i)    The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

> (ii)    the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B)    the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

(6)    Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

With respect to each impaired class of claims or interests-

(A)    each holder of a claim or interest of such class-

> (i)    will receive or retain under the plan on account of such claims or interest property of a value, as of the effective date of the plan, that is not less than

-18-

the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or,

(B)    if section 1111 (b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(8)    With respect to each class of claims or interest-

(A)    such class has accepted the plan; or

(B)    such class is not impaired under the plan.

(9)    Except to the extent that the holder of a particular claim has agreed to a different claim has agreed to a different treatment of such claim, the plan provides that-

(A)    with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B)    with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7)-

(i)    if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii)    if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(C)    with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

(10)    If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

(11)    Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

(12)   All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

(13)   The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection $^{(e)}$(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any prior confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtor believes the confirmation requirements applicable to his case will be met. The Debtor will present evidence in support of each applicable requirement at the Confirmation Hearing.

**B.     Potential Cramdown of the Plan.**

If any impaired Class of Claims does not vote to accept the Plan, the Court may nevertheless confirm the Plan pursuant to the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code. If the Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" to each Class of dissenting Creditors, the Court may confirm the Plan through "cramdown."

**C.     Absolute Priority Rule.**

Simply characterized, the absolute priority rule set forth in Section 1129(b)(2)(B) of the Bankruptcy Code requires a "cramdown" of a plan of reorganization over a dissenting Creditor class to meet an either/or test. Either, (i) the members of each dissenting impaired class of unsecured claims must receive property of a value, as of the effective date of the plan, equal in amount to such class members' allowed claim; or (ii) the holders of claims and interest that are junior to each dissenting impaired class of claims must not receive any property under the plan of reorganization. The absolute priority rule applies only in cases when a class of claims or equity interests is both impaired and does not accept the plan. Thus, the absolute priority rule does not apply to all classes of claims and equity interests but only to the dissenting class and classes junior to the dissenting class.

## XIII.  CONCLUSION

The Court determined that this Disclosure Statement contains information sufficient in quantity and quality for the holders of Claims to make an informed judgment in exercising their right to vote on the Plan. The Debtor believes that the Plan proposed is a responsible and prudent method of restructuring the Debtor's affairs and constitute the best opportunity for Claimants to be paid.

**THE PLAN CONTAINS NUMEROUS OTHER TERMS AND PROVISIONS. WHILE THE DEBTOR HAS SOUGHT TO SUMMARIZE THE MORE SIGNIFICANT TERMS AND PROVISIONS WITHIN THIS DISCLOSURE STATEMENT, YOU ARE URGED TO READ THE PLAN CAREFULLY.**

DATED: December 16, 2010

Respectfully submitted,

FRANCISCAN COMMUNITIES VILLA
DE SAN ANTONIO, an Illinois not-for-
profit corporation

/s/Robert W. Zimmer

By:    Robert W. Zimmer

Ronald Hornberger
Plunkett & Gibson, Inc
Ste 1100, 70 N. E. Loop 410
San Antonio, Tx 78216
Tel    210-734-7092
Fax    210-734-0379
Email  hornbergerr@plunkett-gibson.com
Attorneys for Debtor